**UNITED STATES of America, Plaintiff,**

v.

**Ali Erdogan GURTUNCA a/k/a "Ali Turk", Defendant.**

**No. 85–CR–26.**

United States District Court,
E.D. Wisconsin.

July 10, 1986.

Nathan Fishbach, Asst. U.S. Atty., Milwaukee, Wis., for plaintiff.

Robert Meldman and Thomas Mountin, Meldman, Case & Weine, Milwaukee, Wis., for defendant.

---

TERENCE T. EVANS, District Judge. Any fool can tell the truth, but it requires a man of some sense to know how to lie well ... Samuel Butler

## DECISION AND ORDER

What do the following people have in common?

1. A Pit Broker at the Board of Trade in Chicago
2. The President of a bank in Oklahoma City
3. The President of a development company in Fargo, North Dakota
4. A businessman in Mexico City
5. The Executive Vice President of Penthouse International in New York
6. The President of a company that manufactures scrap metal processing equipment in Mission Viejo, California
7. A Tax Shelter Specialist in Boston
8. An Investment Broker in Dallas
9. A self-employed Financial Consultant in Virginia, and
10. A Santa Monica, California developer of mines in Oregon.

The answer—they all have done business with Ali Gurtunca. They also have something else in common. All of them probably wish they had never met Ali Gurtunca. Thirty-eight witnesses, including the ten described above, testified during the trial of this case in which Mr. Gurtunca is charged with four counts of filing false income tax returns. At the conclusion of the trial I took the matter under advisement. The following constitutes my decision.

When promoters and developers need money to finance major projects such as shopping centers, apartment buildings, and condominium developments, they generally look to banks and other conventional lending institutions for funds. When the conventional sources do not come across, usually because they sense that the project or the promoters are a bit too risky, unconventional sources of financing are often sought. And, some sources of unconventional financing are more unconventional than others. So meet Ali Gurtunca, also known as Ali Turk, a 54-year old resident of Fox Point, Wisconsin, an unconventional source of unconventional financing.

Ernest Hemingway once noted that a big lie is often more plausible than the truth. Hemingway would have liked Gurtunca.

Gurtunca is a big man, both in height and in weight. He carries a cane with a jewel-like decorative knob on the end. He sold the big lie with a vengeance—holding himself out as someone who had "connections" to millions of dollars of oil money in far away places like Saudi Arabia and Kuwait. In the pursuit of his business, Gurtunca traveled first class all the way. He charged his "clients" in the area of $1,000 a day just for expenses.

Gurtunca was able to convince a lot of people that he had the power to solve their financing dilemmas, for many gave him significant sums of money to act as a loan broker on their behalf. Gurtunca here was not pulling off a confidence game on unsuspecting little old ladies living on widows' pensions, nor was he fooling naive fellows who run with the Brie and Perrier crowd. No, Gurtunca was swimming with sharks. Many of his "victims" had been around the block a few times themselves. Ezra Raiten, a convicted check kiter from Los Angeles, needed $16.5 million for a high-rise building in Los Angeles, Jerry Ranke, convicted of mail fraud, needed funds for a 622-unit apartment complex in Palatine, Illinois, and Francis Rosenbaum of Virginia, convicted of mail fraud and perjury, was trying to get $60 million for Penthouse International so it could build a hotel-casino facility in Atlantic City, New Jersey. These, and a long list of others, relying on Gurtunca's "connections", gave him significant sums of money.

Out of this situation came an indictment charging that Gurtunca, for the years 1978 through 1981, filed false income tax returns by failing to list, under gross receipts on Schedule C of his return, sums received in his loan brokerage business. Beyond a

reasonable doubt, and actually beyond any doubt, I find Mr. Gurtunca to be guilty of all four counts as charged.

Specifically, Gurtunca was charged with 4 counts of violating 26 U.S.C. § 7206(1). The statute is violated when a person:

Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter....

■ While the parties here disagree a bit as to the elements of the offense, I accept that they are:

1—That the defendant made and subscribed the income tax returns which were false as to the material matter

2—That the tax returns subscribed to by the defendant contained a written declaration that they were made under the penalties of perjury;

3—That the defendant did not believe the returns to be true and correct as to every material matter; and

4—That the defendant falsely subscribed to the returns willfully, with the specific intent to violate the law.

Framed another way, the issue here, viewed as the elements of the crime charged, is whether the funds received by Gurtunca as a loan broker should have been reported on Schedule C of his tax returns for the years in question and, if so, whether his failure to so report them was willful.

When "clients" sought out Gurtunca's help in securing loans from his mysterious foreign sources, Gurtunca usually told them that in order to obtain the funds he needed an advance payment to cover such items as his fees, loan processing expenses, and/or travel. This daily fee ranged from $400 to $1,000 per day. Gurtunca often told his clients that the advance payments were nonrefundable. On other occasions, however, he told them that their payments would be refunded upon the successful closing of their loans, but there was no

provision for returning the payments if the loans were not made. Finally, on some occasions, he stated that the advance payments were refundable regardless of whether he successfully obtained the loans.

Gurtunca received $437,063.97 from various loan-seeking clients during the years in question. All of the payments (except for James Kollar's $15,000 cash payment in April, 1978) were made by either check or wire. Upon receipt of the payments, Gurtunca usually placed the money directly into his bank account at the Citizens North Shore Bank. The payments were not placed into a separate business trust account or separated from any other transaction (business or personal) which Gurtunca was handling.

During the years in question, the following gross receipts were reported on Gurtunca's returns:

| 1978 – | $ 15,300 |
|--------|----------|
| 1979 – | 14,250 |
| 1980 – | 61,000 |
| 1981 – | 93,000 |
| | $183,550 |

The government claims the correct reportable gross receipts were:

| 1978 – | $ 87,046 |
|--------|----------|
| 1979 – | 79,500 |
| 1980 – | 92,817.97 |
| 1981 – | 177,700 |
| | $437,063.97 |

The payments provided to Gurtunca should have been reported as gross receipts on his income tax returns. They were given so that he could obtain loans. Upon receipt of the payments, Gurtunca maintained total dominion and control over the funds. There were no restrictions on his use of the funds.

Gurtunca's control over the funds is demonstrated by the manner in which he used them. After receiving the payments, he placed most of the funds in his bank account, commingling them with his personal funds. An example of this commingling occurred in 1978. During that year, Gurtunca received $87,046 in payments from

clients; of this amount, he placed $70,096 into his bank account. During the same year, he wrote checks totaling $31,614.14 on this same account to purchase personal items like clothing, home furnishings, luggage and jewelry.

The terms under which Gurtunca's clients provided payments to him demonstrate that he had complete control over them. On many occasions, the payments were nonrefundable. On other occasions, Gurtunca stated that the payments were refundable at closing, but he rather cleverly avoided saying what would happen if a closing did not occur. If he had any obligation to repay, it was contingent upon his success in obtaining the funding.

On rare occasions, Gurtunca said that the funds would be refunded regardless of whether he obtained financing. Here it could be argued that the payments were loans. However, they did not have any of the attributes of a loan: no interest terms were stated, no restrictions were placed on the disposition of funds, and no document memorializing the transaction as a loan was created. Further, Gurtunca did not treat the payments as loans, since he repaid funds to his clients about as often as the Golden State Warriors beat the Boston Celtics. Thus, even in these situations, Gurtunca had total control over the use of the funds which he received.

■ In short, these funds were received by Mr. Gurtunca without any recognition of an obligation to repay them and without any restriction on their disposition during the course of operating Gurtunca's loan-brokerage business. I find that they should have been reported as gross receipts on Gurtunca's Schedule C for that business for the years in question. The distinctions drawn from the testimony of Attorneys Dale Sorden and Joseph E. Tierney, III, though interesting, are rejected.

Sorden and Tierney are respected, experienced tax attorneys practicing in the Milwaukee area. They agreed that if Gurtunca received the funds as alleged, they were reportable somewhere on his return as part of his adjusted gross income. However, in answer to hypothetical questions, each said that the funds were not reportable as gross receipts on Gurtunca's Schedule C as a consultant if they were fraudulently obtained. Sorden and Tierney conclude that if Gurtunca was a thief, the funds obtained were not part of his consulting business and should have showed up instead as "other income" on page 1 of his Form 1040. Sorden also noted that it was conceivable that a separate Schedule C listing "Thief" as the business of the taxpayer could have been used.

■ Gurtunca, of course, did not report the receipt of the funds obtained in this case anywhere on his returns. Because, however, those funds were received by Gurtunca as a loan broker-consultant, and because they were related to that business even though Gurtunca may have been a fraud, a crook or a thief, they were reportable on the Schedule C's as charged.

If Gurtunca had been a baker and, on the side, had sold marijuana from the back door of his bakery, an argument along the lines suggested by Sorden and Tierney might have more appeal. Then, with a straighter face, one could say that his marijuana income does not belong on his bakery business Schedule C. If, however, Gurtunca the baker had laced his brownies with marijuana and sold them at his counter, the money received from their sale would have been reportable on his bakery business Schedule C. When the relationship between the stated business and the means by which the funds are obtained is close, as it is here, the funds are reportable on a business Schedule C. Of course, if the baker made a mistake (we're not dealing here with a precise science) and reported his marijuana brownie receipts as other income, his failure to list it on his bakery Schedule C would not be a criminal violation, as no willfulness would be involved. Gurtunca didn't list the funds anywhere and, on the basis of this record, can't claim mistake.

Lastly, I have no trouble concluding that Gurtunca's understatement of his gross re-

ceipts was willful and that he possessed the specific intent to violate the law. His understatements were clearly beneficial to him, as he avoided a tax liability of over $100,000 for the years in question. The understatements gave Gurtunca more cash to facilitate his role as the well-connected international power broker. Also, Gurtunca's conversations with clients, particularly Robert Gile and David Pramhus, demonstrate that he had a working knowledge of the tax laws.

Therefore, I find Mr. Gurtunca guilty on all counts, order a presentence investigation, and schedule sentencing for August 26, 1986, at 8:30 a.m.